UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dane Technologies, Inc.,

        Plaintiff,

v.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-2730 ADM/JJK

Gatekeeper Systems, Inc.,

        Defendant.

___

Paul J. Robbennolt, Esq., Winthrop & Weinstine, P.A., Minneapolis, MN, on behalf of Plaintiff.

Benjamin A. Katzenellenbogen, Esq., Knobbe, Martens, Olson & Bear, LLP, Irvine, CA; David R. Fairbairn, Esq., Kinney & Lange, P.A., Minneapolis, MN, on behalf of Defendant.

___

## I. INTRODUCTION

On September 11, 2014, a supplemental claim construction hearing was held before the undersigned United States District Judge in the patent infringement action brought by Plaintiff Dane Technologies, Inc. ("Dane") against Defendant Gatekeeper Systems, Inc. ("Gatekeeper"). Dane alleges Gatekeeper infringes claims of United States Patent Nos. 6,220,379 (the "'379 Patent"), 7,389,836 (the "'836 Patent"), and 7,493,979 (the "'979 Patent") (collectively, the "Patents-in-Suit").

## II. BACKGROUND

Dane is a Minnesota corporation, with its principal place of business in Brooklyn Park, Minnesota. Compl. [Docket No. 1] ¶ 1. Dane owns by assignment the three patents at issue in this case. On April 24, 2001, the United States Patent and Trademark Office ("PTO") issued the '379 Patent, entitled "Cart Retriever Vehicle." Id. ¶ 7. On June 24, 2008, the PTO issued the '836 Patent, entitled "Power-assisted cart retriever with attenuated power output." Id. ¶ 8. On

February 24, 2009, the PTO issued the '979 Patent, also entitled "Power-assisted cart retriever with attenuated power output." Id. ¶ 9. In basic terms, these Patents cover "shopping cart retrievers with motor controllers that have features designed to protect the motor." Id. ¶ 11.

The complete procedural background, including descriptions of the technology at issue and excerpted claim language from the Patents-in-Suit, has been fully recited in the July 14, 2014 Memorandum Opinion and Order and is incorporated by reference. See Mem. Op. and Order [Docket No. 210] (the "July Order"). While the first construction hearing was under advisement, Dane moved to amend their infringement contentions. Mot. Am. Infring. Cont. [Docket No. 124]. Magistrate Judge Keyes granted Dane's request on May 27, 2014. Order Grant. Mot. Am. Plead. [Docket No. 190].

The parties have agreed on six additional terms for construction. The terms the parties dispute are "Manual Mode," "Remote Mode," and "Mode Selector," from claims 1, 17, and 27 of the '379 Patent. Decl. Nicholas M. Zovko [Docket No. 215] ("Zovko Decl.") Ex. L at 3; Id.[1] Ex. M at 1-2. Also in dispute from claim 1 of the '836 Patent and claims 1 and 14 of the '979 Patent is "Normal Power Limit," and from claim 1 of the '836 Patent and claims 1, 4, 14, and 21 of the '979 Patent, "Maximum Power Output." Id. Ex. L at 3; Id. Ex. M at 2. Finally, the term "Controller" is in dispute from claims 1, 6, and 7 of the '836 Patent and claims 1, 8, and 14 of the '979 Patent. Id. Ex. L at 3; Id. Ex. M at 2.

The parties agree in principle but disagree as to the scope of construction for the claim term "Wherein the [second or first] power limit is [selected or set] to provide a power output level that prevents the retriever from being subjected to an overload condition" in claim 3 of the

---

[1] All Id. citations in the Background section refer to the Zovko Declaration.

'836 Patent and claims 3 and 16 of the '979 Patent.  Id. Ex. L at 4; Id. Ex. M at 3.

Gatekeeper also requests supplemental construction of the means plus function claim term "Controlling Means" in claims 18 and 21 of the '979 Patent, which was construed in the July Order.  Gatekeeper's request is premised on new arguments raised after the first claim construction hearing.  Id. Ex. L at 3; Supplemental Responsive Claim Construction Br. [Docket No. 214] ("Gatekeeper Responsive Br.") at 25.

### III.  DISCUSSION

#### A.  Standard of Review

Claim construction is a matter of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  In construing claims, courts should look first to intrinsic evidence, which includes the claims, the specification, and the prosecution history.  Vitrionics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quotation and citations omitted).  However, a patentee can choose to be "his or her own lexicographer by clearly setting forth an explicit definition for a claim term."  Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999).  Claim terms "should be construed consistently with [their] appearance in other places in the same claim or other claims of the same patent."  Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).  In addition, the specification is usually "dispositive; it is the single best guide to the meaning of a disputed term."  Vitrionics, 90 F.3d at 1582.  Courts are

nonetheless cautioned not to import limitations from the specification into the claims.  Phillips, 415 F.3d at 1323; Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998).

While courts can consider extrinsic evidence to educate themselves about the patent and technology at issue, it is improper to rely on extrinsic evidence in construing claims unless, after consideration of all the intrinsic evidence, ambiguity remains.  Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc., 152 F.3d 1368, 1373 (Fed. Cir. 1998); Vitrionics, 90 F.3d at 1584.  Extrinsic evidence is "evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."  Vitrionics, 90 F.3d at 1584.  Dictionaries may be useful to courts in understanding the ordinary and customary meaning of words, and courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."  Phillips, 415 F.3d at 1322-23.

## B. Claim Construction

### 1. "Manual Mode" in Claims 1, 17, and 27 of the '379 Patent

Dane submits that the term "Manual Mode" does not need to be construed.[2]  Gatekeeper argues that "Manual Mode" is "a user-selectable state of the vehicle in which the vehicle can only operate in response to manual control signals and cannot operate in response to remote control signals."  Gatekeeper Responsive Br. at 12.  The dispute of the term "Manual Mode"—and the terms "Remote Mode" and "Mode Selector"—as advanced by Gatekeeper,

---

[2] Dane has supplied a proposed construction in the event the Court determines it is necessary to construe "Manual Mode."  Because "Manual Mode" does not require construction, Dane's proposed language is not recited.  For the same reason, Dane's proposed constructions of "Remote Mode," "Mode Selector," "Normal Power Limit," and "Maximum Power Output" are omitted.

centers on operational exclusivity; namely, whether selecting one operational mode must act to "lock out" the other, unselected mode from controlling the vehicle.

### a. Extrinsic Evidence Does Not Factor Into The Construction

The gravamen of Gatekeeper's position stems from evidence outside the specification and the claim language. Relying on extrinsic evidence to construe the meaning of a disputed term is improper if the term is unambiguous. Mantech Envtl. Corp., 152 F.3d at 1373. Extrinsic evidence may be considered, however, if it is necessary to assist in understanding a technical term. Optical Disc Corp. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999).

Gatekeeper has not demonstrated that "Manual Mode" is an ambiguous term. Gatekeeper attempts to create ambiguity by highlighting the parties' divergence on the plain and ordinary meaning of "Manual Mode." Extrinsic evidence, however, "cannot be relied on to change the meaning of the claims when that meaning is made clear by [the patent and the prosecution history]." Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1578 (Fed. Cir 1995). "Manual Mode," as described in the specification and claim language, is not an uncertain term. The specification or claim language does not, as argued by Gatekeeper, suggest the term "Manual Mode" may be understood with a notion of operational exclusivity. Rather, the intrinsic evidence on the matter of exclusivity states that the selection of an operational mode is exclusive, not the operation of the mode itself. Moreover, terms with clear, ordinary meanings do not require further construction. O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd., 521 F.3d 1351, 1360 (Fed. Cir. 2008). "Manual Mode" is a "non-technical term[] in general usage" and does not need extrinsic evidence to aid its understanding. Optical Disc Corp., 182 F.3d at 1309. Because "Manual Mode" is a non-technical term that lacks ambiguity,

extrinsic evidence is not relied upon to understand the term.

### b. Term Construction

Gatekeeper argues for the inclusion of a limitation in the definition of a claim term. Limitations, however, are not to be read into a claim unless the limitation is supported by the actual words of the claim. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). "The claims themselves control." Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1054 (Fed. Cir. 1989).

The specification states "Manual Mode" is when "the operator controls functions from the control console 22 on the steering column 24 and drives the vehicle using the steering wheel 20 and the speed/brake pedal 19." '379 Patent 11:65-67; 12:1. The claim language states that "Manual Mode" is one of the "operational modes." Id. at 13:22-23.

The specification and claim language do not support the exclusivity concept described in Gatekeeper's proposed construction. Gatekeeper argues the relationship between the disputed term and other phrases in the claim language, such as "selecting between" or "selecting one," backs the one-or-the-other concept their construction embodies. But the phrases Gatekeeper cites describe the act of selection as exclusive, not operation. The claim language states that manual and remote modes cannot both be selected at the same time. The specification and the claim language say nothing about the operational modes as being exclusive. Gatekeeper argues operational exclusivity must exist otherwise the selectable modes, manual and remote, would not be modes but rather only the type of control used to operate the retriever. Failing to incorporate operational exclusivity, Gatekeeper asserts, would read limitations out of the claim. However, "selecting between" operational modes without operational exclusivity is evidenced in other

6

technologies.

For example, a camera possess the ability, usually by pressing a button or similar object, to manipulate the shutter and take a photograph. Select camera models also come with the ability to manipulate the shutter without depressing the button on the camera. This feature functions through an input for hooking up a tethered remote, or a sensor, for accepting an infrared or other wireless signal. These features allow users to take photos without touching the actual camera. Some camera models require the user to select a certain type of operational mode to enable this feature. This type of functionality is sometimes called "remote mode." On some cameras, even if this operational mode is selected, the traditional, manual way of operating a shutter still functions. The selection of the mode is exclusive, but the selected operation is non-exclusive. This illustrates it is possible to "select between" operational modes without requiring any lock-out of the non-selected mode.

In sum, "Selecting between" or "selecting one" type of mode does not require the limitation Gatekeeper seeks with its proposed definition. "Manual Mode" is accorded its plain meaning.

### 2. "Remote Mode" in Claims 1, 17, and 27 of the '379 Patent

Dane submits that the term "Remote Mode" does not need to be construed. Gatekeeper argues that "Remote Mode" is "a user-selectable state of the vehicle in which the vehicle can only operate in response to remote control signals and cannot operate in response to manual control signals." Gatekeeper Responsive Br. at 12. Gatekeeper advances a parallel argument for urging exclusivity into the definition of "Remote Mode" as made for including exclusivity in "Manual Mode." For the same reasons described in Section III.B.1.b., "Remote Mode" is

accorded its plain meaning.

### 3. "Mode Selector" in Claims 1, 17, and 27 of the '379 Patent

Dane submits that the term "Mode Selector" does not need to be construed. Gatekeeper argues that "Mode Selector" is a "user-selectable input component (such as a button or switch) that acts independently of the components that generate operator signals to operate the vehicle." Id. Gatekeeper argues the issue is not that the "Mode Selector" needs to be physically distinct from the speed controls, but that it must act independently from the speed control components.[3]

Claims 1 and 27 describe "a control panel having a mode selector selecting between a plurality of operational modes, including a manual mode and a remote mode." '379 Patent at 13:21-23; 16:16-18. Claim 17 uses the phrase "for selecting one of" instead of the "selecting between" phrase in Claims 1 and 27. Id. at 15:1-3.

Gatekeeper's proposed construction attempts to import a limitation that is not indicated in the claim language. Nothing in the specification or claim language prevents the mode selector from acting as the component that generates operator signals. The specification only states that the mode selector be understood as a switch or button. Nothing prevents this button or switch

---

[3] Gatekeeper argues that the term "Mode Selector" confirms their contention that the vehicle requires distinct and exclusive operational modes. As discussed in Section II.B.1. above, the specification and the claim language does not support this conclusion. As demonstrated, it is possible to have a plurality of operational modes without one mode locking out the other. Gatekeeper relies in part on the prosecution history discussing mode selector as requiring a switch or button to avoid conflicting signals as further support for operational exclusivity. Decl. Nicholas M. Zovko [Docket 101] Ex. A at 130-32, 152-53. Avoidance, however, is not prevention. As described in the specification and claim language, the mode selector could establish an operational hierarchy should both manual and remote signals be sent to the vehicle at the same time. This construct would not prevent conflicting signals. Both signals would reach the vehicle, but only one operational mode would take priority and possess control of the vehicle.

from also acting as the control that generates operational signals to the vehicle. Thus, the plain language does not support construing "Mode Selector" with the requirement that it act independently of the controls that generate operator signals.

Gatekeeper points to extrinsic evidence to advance its position. As previously established, this is improper when the intrinsic evidence does not render the term ambiguous. Mantech Envtl. Corp., 152 F.3d at 1373. Since the intrinsic evidence for "Mode Selector" does not present any ambiguity, extrinsic evidence is an improper source for construing this disputed term. For these reasons, the term "Mode Selector" does not require construction and is accorded its plain meaning.

  **4. "Normal Power Limit" in Claim 1 of the '836 Patent and Claims 1 and 14 of the '979 Patent**

Dane submits that the term "Normal Power Limit" does not need to be construed. Gatekeeper argues that "Normal Power Limit" should be construed as the "most common limit on the amount of power (or current), and having no restriction on the length of time during which it can apply." Gatekeeper Responsive Br. at 17.

The claim states: "[T]he first power limit is the controller's normal power limit . . . ." '836 Patent 8:28-29; '979 Patent 8:27-28. The claim language makes clear that "Normal Power Limit" is referring to the first power limit.

Gatekeeper's proposed construction attempts to include an element of frequency that is not found in the claim or the specification. Injecting such language into the claim is improper for two reasons. First, all three power limits—first, second, and burst—can be programmed into the controller at the same time, belying the notion that the first power limit must be the most

9

common or frequent. Next, the second and burst power limits are set <u>below</u>[4] the first power limit. Thus, if the second and burst power limits are programmed into the controller and power is being limited, the second or burst limits are actively attenuating power. The first power limit does not limit the power output in any way. It is unclear if the first power limit in this scenario could be understood as "most common" because it is not active. Such a construction invites jury confusion and must be avoided.

     **5.**    **"Maximum Power Output" in Claim 1 of the '836 Patent and Claims 1, 4, 14, and 21 of the '979 Patent**

Dane submits that the term "Maximum Power Output" does not need to be construed. Gatekeeper argues that "Maximum Power Output" must be clarified as the "upper limit on the amount of power (or current) that the controller may output at a specific point in time or under specific conditions." Gatekeeper Responsive Br. at 20.

The specification and claim language does not contemplate the maximum amount of power the controller may output as conditionally dependent. True, the specification explains how varying cart sizes and weather conditions may require different power levels to move identically numbered cart trains, but nowhere does it state the maximum amount of power the controller can output is variable. The maximum output of the controller is the same if two carts are being moved in sunny Arizona or 20 carts are being moved in snowy Minnesota. While more power will likely be required to move the carts in Minnesota, the controller's maximum

---

[4] The specification teaches the first power limit is the internal limit on the amount of power the controller may output. '836 Patent 4:52-58. Thus, if the second and burst power limits are programmed into the controller, they must be programmed at power levels that are lower than the first power limit. For example, if a value of 100 is assigned for the first power limit, the second and burst power limits must be programmed at a level less than 100.

power output is unchanged. Because construing "Maximum Power Output" risks jury confusion, it is accorded its plain meaning.

### 6. "Controller" in Claims 1, 6, and 7 of the '836 Patent and Claims 1, 8, and 14 of the '979 Patent

Dane submits that the term "Controller" is "a controller suited to provide power to the motor of a shopping cart retriever." Pl.'s Supplemental Claim Cons. Reply Mem. [Docket No. 217] ("Pl.'s Reply Mem.") at 17. Gatekeeper agrees with Dane's proposed language but requests that the definition explicitly include 24-volt controllers. Gatekeeper Responsive Br. at 24. Because the parties agree that "A Controller" is "a controller suited to provide power to the motor of a shopping cart retriever," the Court accepts this definition. Gatekeeper's request to explicitly include 24-volt controllers in the definition will not be adopted because it is unsupported by the intrinsic evidence.

The specifications of the Patents provide a list of "Exemplary controllers[5] that can be used to limit current . . . ." '836 Patent at 6:45-50; '979 Patent at 6:45-50. Gatekeeper asserts that since at least some of the "exemplary controllers" are 24-volt controllers, the specification buoys their position that "Controller" must explicitly include 24-volt controllers within the definition.

The "exemplary controllers" listed in the specification identify controllers that can be used to limit the power output of the electric motor to prevent damage. The list of "exemplary controllers" is not used in the specification to describe a series of controllers that are "suited to

---

[5] The "Exemplary controllers" are: Control Systems, Inc. models CS1108, CS1125, and CS1126 and PML Flightlink, Ltd. model PMA90-1220. '836 Patent at 6:45-50; '979 Patent at 6:45-50.

provide power to the motor of a shopping cart retriever." The list does not address whether the "exemplary controllers" can perform the function embodied by the definition. Further, both the specification and the claim do not contain any language identifying controller voltages at specific level or levels. Indeed, a 24-volt controller may meet the definition agreed on by the parties, but the determination is made irrespective of the controller's voltage. Put simply, the inquiry is limited to whether the controller is suited to provide power to the motor of a shopping cart retriever. If a 24-volt controller is suited to provide power to the motor of a shopping cart retriever, then it falls within the patents' definition of a "Controller".

### 7. "Controlling Means" in Claims 18 and 21 of the '979 Patent

Dane submits that the term "Controlling Means" was previously construed by the Court and reconsideration is therefore inappropriate.[6] Gatekeeper argues that supplemental construction, not reconsideration, is requested based on new arguments that were raised after the first claim construction hearing. Gatekeeper argues that the "Controlling Means" limitation must be construed as including 24-volt controllers. Dane opposes this construction.

The "exemplary controllers" in the specification list controllers of various voltages.[7] '979 Patent at 6:45-50. Neither the claim nor the specification supports singling out 24-volt controllers. Including a discrete voltage level in the definition suggests at least some doubt as to

---

[6] The definition established in the July Order for the corresponding structure of the means plus function term "Controlling Means" is "a controller in analog or digital form so as to provide an ability to limit the electric current or voltage." July Order at 16-17.

[7] The Control Solutions CS1108 controller series listed in the specification is available in 12V, 24V, and 36V versions. *Control Solutions LLC CS1108 Series Motor Controllers*, CONTROL SOLUTIONS, http://http://www.controls.com/products/cs1108/ (last visited October 14, 2014).

whether or not controllers other than the stated voltage fit within the definition and is unnecessary.

As such, Gatekeeper's proposed language in the definition of "Controlling Means" is unsupported by the intrinsic evidence and risks jury confusion. Therefore, the definition stated in the July Order will be applied.

### 8. "Wherein the [Second or First] Power Limit is [Selected or Set] to Provide a Power Output Level that Prevents the Retriever From Being Subjected to an Overload Condition" in Claim 3 of the '836 Patent and Claims 3 and 16 of the '979 Patent

The parties disagree on the extent this claim term needs construction. Dane's proposed definition is "The power output limit is set to provide a power output level that restricts the number of shopping carts the shopping cart retriever can move." Pl.'s Reply Mem. at 20. The beginning of the proposed definition mirrors the claim language until "power output level." After that phrase, the definition seeks to identify how to "Prevent[] the Retriever From Being Subjected to an Overload Condition." Dane's briefing refers to this as the "'Overload Prevention' element." Id. Gatekeeper argues the entire claim term does not need to be construed. If the claim term is construed, Gatekeeper asserts that only "Being Subjected to an Overload Condition" needs construction. Gatekeeper Responsive Br. at 25-26.

#### a. "Being Subjected to an Overload Condition"

It is essential to define a condition before determining how that condition can be prevented. Without knowing what an overload condition is, any definition of the "Overload Prevention" element lacks sufficient meaning to assist the jury. Gatekeeper submits "Being Subjected to an Overload Condition" is "regularly allowing the motor to provide power to the drive system at levels that exceed failure levels." Id. Gatekeeper's proposed definition

13

accurately tracks the specification's terming of what "Overload" is. '836 Patent at 7:10-14. Accordingly, "Being Subjected to an Overload Condition" will be construed as "regularly allowing the motor to provide power to the drive system at levels that exceed failure levels."

### b. "Prevent[ing] the Retriever From Being Subjected to an Overload Condition"

Dane submits that the Overload Prevention element be defined as "[t]he power limit is set to provide a power output level that restricts the number of shopping carts the shopping cart retriever can push." Pl.'s Reply Mem. at 20. In essence, Dane's proposed definition argues that restricting the number of carts the retriever can push will prevent the controller from "regularly allowing the motor to provide power to the drive system at levels that exceed failure levels." Thus, Dane argues, the number of carts being moved is the factor that causes an overload condition.

The specification sets forth that restricting the number of shopping carts the retriever can move prevents overload. The specification identifies one of the invention's advantages over the prior art is the ability to move a greater number of shopping carts at one time. The specification recognizes the need to prevent operators from overloading the retriever because moving an "exceedingly long" train of carts can potentially damage the invention. '836 Patent at 2:6-14. To this end, the specification teaches that internal damage to the retriever can be prevented by setting the programmable power limits. While Dane is correct that the number of carts being moved is what causes an overload condition, the power limits are what directly work to prevent the overload condition from occurring. Dane's construction misplaces what actually prevents overload and is inconsistent with the specification and the claim language. For this reason, it will not be adopted. "Wherein the [second or first] power limit is selected to provide a power

output level that prevents the retriever from" is accorded its ordinary meaning.

### C. Reconsideration

Gatekeeper urges reexamination of "Control Panel" that was established in the July Order.[8] Gatekeeper's argument is premised on two recent Federal Circuit decisions discussing the import of using the term "the present invention." Dane opposes disturbing the previous construction on procedural grounds and on the merits.

The plain and ordinary meaning will be ascribed to claim terms absent lexicography or disavowal. Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Disavowal of a claim term requires the specification or the prosecution history to clearly show "that the invention does not include a particular feature." SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001).

The July Order considered the arguments Gatekeeper advances here. As previously argued by Gatekeeper, "Dane's description of 'the present invention' as having a control panel that is separate and distinct from the remote control is 'strong evidence' that the Court should construe 'control panel' as a separate component of the vehicle from the remote control." Def.'s Surreply Claim Constr. Br. [Doc. 114] at 18. Gatekeeper cited Federal Circuit authority in support of its position. The Court, however, did not find Gatekeeper's position persuasive and construed "Control Panel" in accordance with its ordinary and customary meaning.

The recent Federal Circuit decisions Gatekeeper cites does not alter the Court's view. The decisions do not announce any new law on the issue or provide sufficient basis for concluding that the July Order's construction of "Control Panel" is incorrect. Gatekeeper merely

---

[8] "Control Panel" was afforded its ordinary and customary meaning. July Order at 10.

directs the Court to a single piece of evidence extracted from the voluminous prosecution history stating "the present invention <u>may</u>"[9] as basis for finding disavowal (emphasis added). This single phrase, however, does not meet the exacting standards required for finding disavowal.

Because the meaning of "Control Panel" announced in the July Order is not changed, Dane's procedural concerns will not be addressed.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that in interpreting the '379 Patent, the '836 Patent, and the '979 Patent the disputed terms will be construed in accordance with this Order.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: October 17, 2014.

---

[9] While not conclusive on the issue, the word "may" creates a persuasive distinction from the phrases identified by the Federal Circuit decisions Gatekeeper relies upon. The Federal Circuit stated disavowal can be demonstrated through phrases such as "the present invention <u>is</u>," "the present invention <u>requires</u>," or the "present invention <u>includes</u>." <u>Hill-Rom Services, Inc. v. Stryker Corp.</u>, 755 F.3d 1367, 1372 (Fed. Cir. 2014); <u>GE Lightning Solutions v. AgiLight</u>, 750 F.3d 1304, 1309 (Fed. Cir 2014) (emphases added). Unlike "is," "requires," or "includes," the essence of the word "may" necessarily includes at least a modicum of non-essentialness to what follows. Because the standard for disavowal is "exacting," the use of the word "may" further supports the conclusion that the <u>Hill-Rom</u> and <u>GE Lightning</u> decisions do not require any alteration to the July Order on this issue.